UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-7-H

COALITION FOR THE ADVANCEMENT OF
REGIONAL TRANSPORTATION                                         PLAINTIFF

V.

FEDERAL HIGHWAY ADMINISTRATION, *et al.*                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

The Court now considers a variety of motions concerning the Louisville-Southern Indiana Ohio River Bridges Project (the "Project"). In general, Defendants, the Federal Highway Administration ("FHA"), the Kentucky Transportation Cabinet ("Kentucky"), the Indiana Department of Transportation ("Indiana", and collectively with Kentucky, the "States") and various individuals associated with each,[1] seek dismissal of the remaining legal challenges associated with the Project.

Plaintiff, Coalition for the Advancement of Regional Transportation ("CART"),[2] maintains twenty separate claims against Defendants. CART is a volunteer-member, tax exempt § 501(c)(3) organization that promotes modern transit planning, especially encouraging the

---

[1] There are two sets of defendants in this case. The state defendants include Kentucky; Michael W. Hancock, Secretary of the Kentucky Transportation Cabinet; Indiana; and Michael B. Cline, Commissioner of the Indiana Department of Transportation (collectively the "State Defendants"). The federal defendants include the FHA; Victor Mendez, Administrator of the FHA; Karen Bobo, Indiana Division Administrator of the FHA; and Jose Sepulveda, Kentucky Division Administrator of the FHA (collectively, the "Federal Defendants"). Claims against the individual defendants, all named in their official capacities, will be analyzed the same as the claims against the States or FHA.

[2] Originally, National Trust for Historic Preservation in the United States and River Fields, Inc. filed a complaint against Defendants on September 4, 2009 and an amended complaint on September 5, 2012. ECF Nos. 1, 127. CART entered this action on September 4, 2012, when it filed a complaint addressing some of the same issues the original Plaintiffs raised in their complaints. *See* ECF No. 124. National Trust and River Fields have resolved their primary disputes with Defendants and withdrawn from the case. *See* ECF No. 180. Presently, CART is the sole remaining plaintiff.

introduction of light rail to urban transit systems.  Though CART asserts a number of claims arguing that Defendants failed to comply with federal statutory mandates, and otherwise abused their discretion in the planning and implementation of the Project, its general contention is more normative.  It believes that vehicular traffic will decline in future years, making the Project both unnecessary and in all likelihood, unable to obtain adequate funding to service construction loans taken out to finance the Project.  CART maintains that other alternatives, even abandoning the Project altogether, would better serve the community.

The Court's Memorandum Opinion is based upon the extensive Administrative Record that details all that has occurred in the past twenty years leading up to the ultimate selection of the Project's design.  In the course of this Opinion, the Court will not address every issue raised in the media and elsewhere concerning the Project, nor will the Court speculate about future issues or concerns.  It will, however, address each of CART's general and specific claims.  Though reasonable minds could certainly disagree about the necessity of the Project and various decisions made in furtherance of it, it is not the role of the Court to endorse one opinion over the other.  Rather, the Court has been careful to distinguish policy disagreements from Defendants' obligations to follow certain statutory procedures and refrain from taking actions found to be arbitrary and capricious.

I.

Currently, three bridges provide transit across the Ohio River between Jefferson County in Kentucky and Clark County in Southern Indiana.  Beginning with the western-most bridge, the Sherman Minton Bridge carries I-64 traffic between West Louisville and New Albany, Indiana.  About four miles to the east is the downtown George Rogers Clark Memorial Bridge, which

carries U.S. 31 traffic across the Ohio River. Finally, less than half a mile to the east of the Clark Memorial Bridge lies the John F. Kennedy Memorial Bridge ("Kennedy Bridge"), which carries I-65 traffic between downtown Louisville and Jeffersonville, Indiana.

Over the course of a decade, Defendants investigated cross-river traffic issues and the possibility of alleviating problems by building a fourth bridge in East Louisville and reconstructing the existing transportation infrastructure. This culminated in the Project, which is a roughly $2.6 billion construction and transportation management program designed to improve mobility across the Ohio River between Louisville and Southern Indiana. The Project addresses current cross-river traffic congestion and safety needs, provides better navigability within the existing transportation system, and improves cross-river mobility, especially in light of existing and anticipated population and employment patterns in the region. In its current iteration, the Project includes the following five major elements:

- Downtown Crossing: Defendants will reconstruct, expand, and reconfigure the Kennedy Bridge. The existing but reconstructed Kennedy Bridge will carry six lanes of southbound I-65 traffic. Defendants will construct a new bridge parallel to and immediately upstream of the Kennedy Bridge, and this new span will carry six lanes of northbound I-65 traffic. Defendants will also reconstruct the downtown Louisville I-65/I-64/I-71 Kennedy Interchange ("Kennedy Interchange") and approach roadways in Jeffersonville, Indiana.

- East End Crossing: Defendants will construct a new bridge connecting KY 841 (Gene Snyder Freeway) in eastern Jefferson County, Kentucky, with S.R. 265 (Lee Hamilton Highway) in eastern Clark County, Indiana. The East End Crossing will not be part of the Interstate system.

- Tolling: Defendants will place electronic tolling facilities on the expanded and reconstructed Downtown Crossing (both directions) and the new East End Crossing to assist in financing the Project.

- Transportation Management: Defendants will provide enhanced funding for bus service.

- Mitigation Commitments: Defendants will plan and implement various mitigation strategies aimed at ameliorating potential impacts on the natural and human environment resulting from the Project's implementation.

Since the Project's conception, Defendants have undergone various phases of planning and implementation. For purposes of this Memorandum Opinion, the Court will briefly summarize the pertinent events bearing on the Court's decision.

A.

From 1991 to 1994, Kentucky and Indiana sponsored the Metropolitan Louisville Ohio River Bridge Study, which examined four potential cross-river bridge locations. The study recommended further evaluation of two bridge locations in the "Near East" (near the terminus of I-264) and in the "Far East" (near the termini of KY 841 and S.R. 265). In 1995, based on that preliminary study, the Kentuckiana Regional Planning and Development Agency initiated the Ohio River Major Investment Study ("ORMIS"). That study evaluated a wide range of potential transportation schemes to improve cross-river mobility. Ultimately, ORMIS recommended a two-bridge solution, which entailed the construction of a downtown bridge adjacent to the Kennedy Bridge, reconstruction of the Kennedy Interchange, and construction of a bridge in the Far East.

To pursue this recommendation, the States sought federal assistance. To receive federal funding for transportation projects, the FHA must verify that applicants comply with the National Environmental Protection Act ("NEPA").[3] NEPA prescribes a process that federal

---

[3] Additionally, the Project must comply with the Federal-Aid Highway Act ("FAHA"), Section 4(f) of the Department of Transportation Act ("DTA"), the Clean Water Act ("CWA"), the Clean Air Act ("CAA"), and Title VI of the Civil Rights Act of 1964 ("Title VI"). Importantly, the DTA and FAHA institute particular directives upon agencies implementing public projects. For example, "[b]oth the [DTA] and the [FAHA] provide that the Secretary 'shall not approve any program or project' that requires the use of any public parkland 'unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park.' 23 U.S.C. § 138." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411

agencies must follow before taking any action that significantly affects the environment. Most of the claims in CART's complaint concern the NEPA-mandated process. Therefore, the Court finds that this process warrants considerable discussion.

The FHA initiates the NEPA process by publishing a Notice of Intent to prepare an environmental impact statement ("EIS"). 40 C.F.R. § 1508.22. Following the issuance of the Notice of Intent, the agency prepares a Draft EIS. 40 C.F.R. § 1502.9. The EIS must provide a "full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Alternative actions, including a No Action Alternative required to be considered by 40 C.F.R. § 1502.13(d), are measured against the Purpose and Need Statement, which explains why the agency is proposing to spend federal money on an action that potentially results in significant environmental impacts. 40 C.F.R. § 1502.13 ("The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.").

Once the agency publishes the Draft EIS, the public may submit comments in response. Next, the agency must issue a Final EIS, which accounts for public comments, addresses opposing views not already discussed in the Draft EIS, and incorporates any further information necessary to justify implementation of the proposed project. 40 C.F.R. § 1502.9. Finally, the FHA will issue a Record of Decision ("ROD") approving the final proposed action prior to its implementation. Occasionally, the FHA must prepare a supplemental EIS to respond to "substantial changes in the proposed action that are relevant to environmental concerns" or "significant new circumstances or information relevant to environmental concerns and bearing

---

(1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The Court will address compliance with each of these statutes in the substantive portion of this Memorandum Opinion.

on the proposed action or its impacts." *Id.* If the agency issues a supplemental EIS after the ROD, the agency must prepare a revised ROD. 23 C.F.R. § 771.127(b).

B.

On March 27, 1998, the FHA published the Notice of Intent to prepare an EIS based on the ORMIS recommendation. Next, in preparing the Draft EIS, Defendants evaluated the region's transportations issues to compose the Project's Purpose and Need Statement. According to CART, the parties generated the Purpose and Need Statement simply to bring the preexisting bridge plan to fruition, and therefore, Defendants failed to consider the merits of other needed transportation projects. Defendants outline a much more substantive and collaborative process for developing the Purpose and Need Statement. Defendants then identified and analyzed a range of alternatives that could possibly meet the Project's objectives.

The FHA published the Draft EIS in November 2001, and a 101-day public comment period followed. The FHA then published the Final EIS in September 2003, reflecting consideration of public input, potential environmental impacts, and possible adaptions to reduce residual problems.

The Final EIS initially screened a variety of alternatives that can be categorized into five major groups:

- <u>Transportation System Management Alternatives</u> (*e.g.*, traffic signal timing and coordination and HOV lanes);

- <u>Transportation Demand Management Alternatives</u> (*e.g.*, carpooling and congestion pricing);

- <u>Mass Transit Alternatives</u> (*e.g.*, rail transit and enhanced bus service);

- <u>Bridge/Highway Alternatives</u> (including five potential cross-river bridge and highway combinations, Kennedy Interchange reconstruction, and a river tunnel alternative); and

6

- <u>No Action Alternative</u>.

Following the initial screening, Defendants advanced three groups of alternatives that most closely met the tenets of the Purpose and Need Statement: the Transportation Demand Management Alternatives, the Bridge/Highway Alternatives in three locations (Far East, Near East, and Downtown), and the legally required No Action Alternative.[4]

In its secondary analysis, Defendants further evaluated Bridge/Highway Alternatives as to the three proposed bridge locations. Defendants engaged in an investigation of nine potential highway and bridge alignments, each of which included either a One Bridge/Highway or a Two Bridges/Highway Alternative.[5] The inquiry analyzed traffic congestion and traffic safety problems on the existing Ohio River bridges and within the Kennedy Interchange. The FHA considered then-current economic conditions and growth projections based on historical trends and local land use plans. Using this information, the Final EIS identified specific performance measures to evaluate the alternatives and their potential to meet the Purpose and Need Statement.

The Final EIS then advanced four primary alternatives for the Project: the No Action Alternative, the Transportation Management Alternatives, One Bridge/Highway Alternatives, and Two Bridges/Highway Alternatives. Ultimately, Defendants concluded that a Two Bridges/Highway Alternative, called the Selected Alternative, would best meet the Purpose and Need Statement because this option would provide a feasible and prudent long-term solution to the region's cross-river mobility needs.

---

[4] Defendants did consider Mass Transit Alternatives, including both light rail and enhanced bus service. However, Defendants concluded that these Mass Transit Alternatives alone would not sufficiently address the Project's purpose and need. For instance, dismal ridership projections indicated that the light rail system would not meet the region's overarching transportation needs. Defendants did retain enhanced bus service as part of each Bridge/Highway Alternative.

[5] Each alignment also included two options for improvements to the Kennedy Bridge: reconstructing the existing infrastructure in place or building a second parallel bridge.

In September 2003, the FHA issued the ROD, which ratified the Selected Alternative. That scheme entails construction of the East End and Downtown Crossings, and incorporates various transportation management strategies, including enhanced bus service. At that time, Defendants estimated that the Project would cost $4.068 billion.

C.

Having chosen the Selected Alternative, Defendants next focused on funding the Project. In October of 2007, the States submitted the Project's Initial Financial Plan ("IFP") to the FHA, which proposed to entirely fund the Project with traditional federal and state revenue sources. However, by 2009, the relevant parties discovered that only $1.9 billion would be available from traditional sources, leaving a funding shortfall of $2.2 billion.

In response, the Kentucky General Assembly enacted legislation establishing the Louisville and Southern Indiana Bridges Authority (the "Bridges Authority") empowered to create and oversee financial planning for the Project. The Bridges Authority, working with the States, explored various alternative funding methods. In 2010, it submitted an updated IFP, listing tolls as a potential funding option. The Bridges Authority projected revenue from tolling to generate between $800 million and $1.2 billion in additional funding, which when combined with traditional funding sources, would satisfy the Project's funding requirements. In early 2011, the States presented design modifications believed to be capable of reducing the total cost of the Project by $1.2 billion.[6]

As a result of comprehensive changes to the design and funding of the Project and public concern over potential tolling, the FHA and the States decided to prepare a Supplemental EIS for public review and comment. The Supplemental EIS included updated transportation forecasts

---

[6] In July 2012, after the construction bidding process, the States submitted an updated IFP indicating that the design modifications to the bridges would in fact reduce the total cost of the Project by $1.5 billion.

and demographic data based on a new "time of day" model that forecasts traffic and congestion at key times of the day. The new modeling indicated that while some traffic volumes and congestion rates had changed, the basic needs for the Project were still valid. The Supplemental EIS formulation process resulted in the public circulation of an Alternatives Evaluation Report, which re-assessed the alternatives analyzed in the Final EIS in light of the updated data. The report considered the implementation of One Bridge/Highway Alternatives without tolls. Importantly, that evaluation confirmed that One Bridge/Highway Alternatives failed to address the full range of cross-river mobility needs identified in the reaffirmed Purpose and Need Statement. Consequently, Defendants did not conduct an in-depth financial feasibility analysis of those alternatives.

Ultimately, Defendants affirmed the Selected Alternative as the preferred option. However, Defendants acknowledged that non-tolled alternatives alone would be insufficient to fund the Project. Therefore, Defendants recommended a new alternative, the Modified Selected Alternative, which incorporated financing from both traditional sources and toll-based revenues, the States' proposed cost-saving design changes, and the originally selected bridge locations.

In November 2011, the FHA issued the Supplemental Draft EIS for public comment. On April 20, 2012, the FHA published the Supplemental Final EIS, which evaluated the No Action Alternative, the Final EIS Selected Alternative, and the Modified Selected Alternative based on updated socioeconomic and environmental data. It identified the Modified Selected Alternative as the best scheme to meet the Project's purpose and need. Finally, on June 20, 2012, the FHA issued the Revised ROD confirming the Modified Selected Alternative as the preferred option.

D.

Turning to the substance of the Supplemental Final EIS, NEPA requires an EIS to evaluate the Project's environmental consequences. 40 C.F.R. § 1502.10. The Supplemental Final EIS includes a chapter entitled, "Environmental Consequences", which discusses the potential environmental impacts of each alternative, including impacts on socioeconomics, water quality, wetlands, air quality, wildlife, endangered species, land use, historic resources, noise, and aesthetics. 40 C.F.R. § 1502.16. The FHA consulted federal and state agencies in preparing this chapter. Specific to the Project's anticipated locale, the Supplemental Final EIS summarizes the existing water quality in the area, including Harrods Creek and the Wellhead Protection Area. It also considered the adverse impacts to water quality resulting from the Project, most notably analyzing the effects of potential sources of pollution such as de-icing compounds; herbicides and pesticides; oil, grease, and various heavy metals from vehicles; and spillage of toxic chemicals. The analysis concluded that the amount of vehicular pollutants from roadway runoff will be small and cause no material adverse impacts.

Next, the Supplemental Final EIS evaluates potential air quality impacts, describing existing air quality conditions in the Louisville Metropolitan area and the region's compliance with the National Ambient Air Quality Standards for certain pollutants. The Supplemental Final EIS recognizes potential emissions of greenhouse gases, but acknowledges the inherent limitations in evaluating Project-specific greenhouse gas emissions due to the global nature of these emissions. In the end, it concludes that the emissions likely to result from the Project will conform to the applicable air quality standards.

E.

In the Supplemental Final EIS, Defendants also evaluated the Project's potential impact on low income and minority populations. Defendants' analysis relies on 2010 demographic data to identify the affected "environmental justice" populations. It contains a summary of current cross-river travel as illustrated in the Ohio River Bridges User Study, including use of the existing Ohio River bridges by minority and low income individuals. Further, the Supplemental Final EIS evaluates the economic impacts of tolling by analyzing the average cost per trip for travel originating in all Louisville communities.

The Supplemental Final EIS concludes that tolling and other effects of the Project do not disproportionately impact any specific population to a material degree, because all cross-river travelers collectively bear the burden of tolls and the Project would not displace any residents within specific communities. However, the FHA concedes that based on average cost per trip data, the Project is likely to cause a disproportionately high and adverse effect on some low income and minority populations, because the user cost would represent a greater comparative economic burden.

Defendants have considered strategies for mitigating the possible economic effects of tolling on minority populations, including a commitment to develop a tolling policy that is sensitive and responsive to low income and minority populations. For instance, in the final tolling policy, the States have already committed $20 million to the local bus transit system for enhanced bus service, which will abate some of the effect of tolling on minority populations.

F.

In July of 2012, Defendants, in conjunction with the Indiana Finance Authority and the Kentucky Public Transportation Infrastructure Authority, entered into an agreement (the "Toll Agreement") authorizing the Downtown and East End Crossings as tolled facilities. The Toll Agreement asserts that the Project complies with the FAHA, which permits federal participation in the construction of a new toll bridge that is not part of the Interstate System (here, the East End Crossing) and the reconstruction of an existing non-tolled Interstate bridge converted to a tolled facility (allegedly, the Downtown Crossing).

Ten days later, the FHA approved an update to the 2010 IFP. The 2012 IFP includes detailed estimates of the cost to complete the Project with a summary of costs incurred to date, presents key cost-related assumptions, and breaks down costs by year, state, and type of expenditure. Based on an estimated $2.6 billion cost, the update reflects a financing strategy utilizing conventional state and federal transportation funds and toll-based revenues. It evaluates potential financing risk factors, such as the availability of traditional transportation funds, sufficiency of toll revenues, and access to capital markets for toll revenue bonds. Further, it provides mitigation strategies to manage the risk and discusses the anticipated impacts of the Project on each State's transportation programs, budgets, and other projects. The IFP will be updated each year.

II.

CART advances twenty claims[7] against Defendants that can be generally grouped into four categories: the Project (1) violates the procedural mandates of NEPA; (2) violates various

---

[7] CART's original complaint advances fifteen claims. Its first amended complaint adds two counts, Claims Sixteen and Seventeen. CART's second amended complaint alleges three additional counts, mis-numbered Claims

FAHA funding regulations, including the statute's prohibition of federal participation in certain tolled facilities; (3) threatens the water and air quality of the region in violation of NEPA, the CWA and the CAA; and (4) intentionally discriminates against racial minorities in violation of Title VI.[8]

Several dispositive motions are before the Court, but of immediate focus is the parties' cross motions for summary judgment, which will ultimately dispose of all remaining legal claims associated with the Project.[9] The nature of the motion and the nature of the claim dictate the Court's standard of review. In this section, the Court will summarize the standards for reviewing a governmental agency's actions and decisions.

A.

The Court reviews claims brought pursuant to NEPA, DTA, CWA, CAA and FAHA under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-06; *Audubon Naturalist*

---

Seventeen, Eighteen and Nineteen. As Claim Seventeen is listed twice and the two claims state distinct causes of action, the Court will refer to the final three claims respectively as Claims Eighteen, Nineteen and Twenty.

[8] As a threshold matter, the Court notes that Defendants advance compelling arguments as to why CART lacks Article III standing to maintain this action. At this juncture, the Court declines to formally address the issue of standing, except in a few instances particular to specific counts. Given the public nature of this controversy, the Court feels it is best to substantively rule on all claims.

[9] CART filed a motion for summary judgment as to its NEPA claims and a motion for trial as to its Title VI causes of actions in Claim 15. ECF Nos. 178, 179. Defendants filed cross motions for summary judgment on the same and all remaining claims. ECF Nos. 191, 193, 201. The Court will dispose of most of these claims under the motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, which permits courts to dismiss claims where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

The Federal Defendants also filed a motion for judgment on the pleadings as to Claims 10 through 15. ECF No. 174.

> A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) attacks the sufficiency of the pleadings and is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. . . . To survive a motion for judgment on the pleadings, the facts set forth in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.,* more than merely possible."

*United States v. Jewelry House Corp.*, 2011 WL 3501839, *1 (W.D. Ky. Aug. 10, 2011) (quoting *Fritz v. Charter*, 592 F.3d 718, 722 (6th Cir. 2010)).

*Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 542 F. Supp. 2d 642, 660 (D. Md. 2007).

Under the APA, an agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). This highly deferential standard asks whether "the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). The Court's inquiry should "'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Id.* (quoting *Overton Park*, 401 U.S. at 416).

The Court will not substitute its judgment for that of the agency or express a view about the Project. *Overton Park*, 401 U.S. at 416; *Neighbors Organized to Insure a Sound Env't, Inc. v. McArtor*, 878 F.2d 174, 178 (6th Cir. 1989); *see Marsh*, 490 U.S. at 378 (stating that courts should defer to the agency's qualified experts "even if, as an original matter, a court might find contrary views more persuasive"). "The Court will instead look to see if an agency has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action and may not supply a reasoned basis for the agency's action that the agency itself has not given." *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 518 (Fed. Cl. 2011) (internal quotations omitted). Deference is especially appropriate where the action involves matters within the agency's area of technical expertise. *Marsh*, 490 U.S. at 377; *Nat'l Wildlife Fed'n. v. U.S. Envtl. Prot. Agency*, 286 F. 3d 554, 560 (D.C. Cir. 2002). Therefore, as government agencies, if

Defendants' interpretation of its own regulation is reasonable, the Court should defer to it. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

Lastly, a court's review of agency decision making is generally confined to the administrative record before the agency at the time of the decision. *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997). As the Supreme Court emphasized, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142. From time-to-time throughout its briefing, CART references materials outside the record without making any convincing argument why the Court should consider it. In limited circumstances, a court may consider extra-record evidence. *See Slater*, 120 F. 3d at 638 (noting that "in order to justify supplementation, a plaintiff must made a strong showing of bad faith") (internal quotation omitted). However, in the present case, CART does not convincingly allege that Defendants acted in bad faith to warrant supplementation, so the Court will confine its review to the Administrative Record.

B.

Most, if not all, claims advanced implicate NEPA, which is a procedural statute designed to "ensure[] that federal agencies will consider significant environmental impacts of federal action, make available the relevant information, and open to public scrutiny their decision making process." *Audubon Naturalist*, 524 F. Supp. 2d at 660-61. To meet this end, NEPA prescribes the necessary process an agency must follow when it undertakes "major federal action [] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). However, "it is . . . well settled that NEPA itself does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

NEPA does not "require agencies to elevate environmental concerns over other appropriate considerations." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). If the proposed action results in adverse environmental effects that are "adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. Still, the agency must take a "hard look" at the environmental consequences of its decision to satisfy the requirements of NEPA. *Baltimore Gas & Elec.*, 462 U.S. at 97.

An agency satisfies the hard look requirement when it "obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) (citing *Marsh*, 490 U.S. at 378-85)). Though agencies should seriously consider comments elicited from the public and other entities, they need "not necessarily have to defer to them when it disagrees." *Id.*

In reviewing agency decision making, the Court must apply a "'rule of reason' standard, which allows for a deferential review of an agency's compliance with the NEPA requirements." *Audubon Naturalist*, 524 F. Supp. 2d at 662; *see Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 346 (6th Cir. 2006). Under this standard, if the agency's objectives and actions are reasonable, the Court should not disturb the agency's judgment. In sum, "[t]he role of the courts is simply to ensure that the agency has [complied with NEPA by] adequately consider[ing] and disclos[ing] the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec.*, 462 U.S. at 97.[10]

---

[10] Throughout the course of this Memorandum Opinion, the Court will refer to Defendants' obligations under NEPA as mandating a "hard look".

With this analytical framework in place, the Court will evaluate each of CART's claims, and when appropriate, give deference to Defendants' decisions as the law provides.

III.

The Court will first examine CART's assertions that Defendants violated various NEPA procedural requirements. In all, eight of CART's claims seem to fit this category. After careful review, the Court finds that none of the claims advanced convincingly challenge Defendants compliance with NEPA.

A.

Claim 1: Mega-Project

In its first claim, CART makes its broadest assertion: that Defendants improperly joined the East End and Downtown Crossings to create a "mega project" in violation of 40 C.F.R. §§ 1502.4(a), -1508.25 and 23 U.S.C. § 109(h). CART argues that the two major bridge projects will affect distinct geographic areas, each having diverse local transportation needs and likely having different environmental, social and economic impacts. As such, CART maintains that the NEPA regulations required Defendants to proceed with each project independently. CART also asserts that as a result of improperly joining the ventures, Defendants did not adequately address reasonable alternatives particular to each location, thus bypassing the NEPA mandate to fully identify, consider and analyze alternatives to the proposed action.

In deciding to pursue an action implicating NEPA, the agency must first determine the scope of proposed actions. 40 C.F.R. § 1508.25. "Scope consists of the range of actions, alternatives, and impacts to be considered in an [EIS]." *Id.* "Connected Actions" should be addressed in the same EIS if the actions, "when viewed with other reasonably foreseeable or

proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3); *Ocean Mammal Inst. v. Cohen*, 1998 WL 2017631, *7 (D. Haw. Mar. 9, 1998) ("For actions to be 'connected' under NEPA there must be more than mere relatedness or tangential association."). NEPA regulations state that Connected Actions "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; and (iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R § 1508.25(a)(1).

CART contends that the Project does not meet the definitional requirements of Connected Actions because neither bridge project automatically triggered the other and each project has a distinct, localized justification. The Court finds that CART misconstrues NEPA's definition of Connected Actions and that the decision to incorporate both bridges into a single EIS was reasonable and proper.

The decision of whether to pursue a single EIS or to connect the actions "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). The Purpose and Need Statement focuses on the region's overall need for improved cross-river mobility. This focus inevitably led Defendants to explore new bridge locales in the region, including East Louisville, which presently does not have an easily accessible crossing, and to reconstruct existing Ohio River bridges. Defendants reasonably concluded that the region's cross-river mobility needs are so interrelated that a comprehensive evaluation of the range of potential actions necessarily included various one- and two-bridge combinations. *See Diné Citizens Against Ruining Our*

*Env't v. Klein*, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) ("[E]ven though an action could conceivably occur without the previous or simultaneous occurrence of another action, if it would not occur without such action it is a 'connected action' and must be considered within the same NEPA document as the underlying action.").

In fact, had Defendants divided the Project into smaller component parts, the extent of environmental impacts within each EIS might have seemed less significant, effectively reducing the degree of the overall environmental impacts. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1182 (10th Cir. 2002) (noting that NEPA's regulations are designed to prevent separate analyses of two related projects to ensure that "significant cumulative impacts are not to be made to appear insignificant by breaking a project down into smaller components parts"). Thus, by joining the actions in a single EIS, Defendants probably faced a greater probability of not receiving approval. *Cf. Cohen*, 1998 WL 2017631, at *7 (stating that an agency may improperly opt to "segment" a project by breaking down a larger action into smaller pieces to evade preparation of a more comprehensive EIS).

For these reasons, the Court finds that the East End and Downtown Crossings constitute Connected Actions and that the decision to combine them into a single EIS was proper. Therefore, Defendants are entitled to summary judgment on Claim 1.

B.

Claims 14 & 20: Purpose and Need Statement

In Claims 14 and 20, CART advances challenges to the Purpose and Need Statement. NEPA mandates that every EIS "briefly specify the underlying purpose and need to which [it] is responding in proposing the alternatives included the proposed action." 40 C.F.R. § 1502.13.

The Purpose and Need Statement is critical as it dictates the reasonable range of alternatives the agency will consider. *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 971 (S.D. Ohio 2002) ("The purpose and need statement simply defines the goals of the project to allow for the review of an appropriate range of alternatives."). Courts afford agencies considerable discretion in defining the proposed action's purpose and need, and must evaluate it under a reasonableness standard. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998).

However, an agency may not define its objectives so narrow as to confine its range of alternatives since doing so would eviscerate NEPA's mandate to rigorously explore and evaluate all reasonable alternatives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Rather, in defining the action's purpose and need, the agency must take a hard look at factors relevant to the action's objective, such as "the needs and goals of the parties involved" and "the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives." *Id*. After doing so, the agency "must define goals for its action that fall somewhere within the range of reasonable choices." *Id.*

Here, Defendants undertook a widespread, rigorous evaluation of the region's existing transportation infrastructures, travel demands and projected population growth. They sought input from the States, resource agencies and the general public. Throughout the planning and implementation of the Project, the requisite NEPA documents included updated transportation inputs and demographic data, and evidenced a continued need for improved cross-river mobility. Importantly, the Purpose and Need Statement is broadly worded, defining the purpose of the proposed action "as improving cross-river mobility between Jefferson County, Kentucky, and

Clark County, Indiana." Supplemental Final EIS, at 2-6.[11] By expansively casting the purpose of the Project, Defendants' analyses of reasonable alternatives correspondingly broadened. In fact, Defendants considered non-highway alternatives including travel management measures and mass transit options, and ultimately adopted various transportation management strategies in conjunction with the bridges.

In Claim 14, CART contends that the Purpose and Need Statement is drawn too narrowly and thus not made in the public's best interest in violation of 23 C.F.R. § 771.105(b) and FHA Order 6640.23.[12] Specifically, CART contends that Defendants failed to include socioeconomic data of the Louisville Metropolitan area's Title IV populations–that is, minority populations–in defining the Project's purpose and need, thus limiting the universe of reasonable alternatives. The Administrative Record, however, does not support this contention. The Final EIS and Supplemental Final EIS considered relevant employment and demographic data for the region, including the minority communities, in evaluating the continued need for cross-river mobility. Final EIS, at 5-2–7; Supplemental Final EIS, at 5-6–9. Consequently, the Administrative Record shows that Defendants did take a hard look at socioeconomic data in its development of the Purpose and Need Statement.

Finally, Claim 20 asserts that the Final EIS's Purpose and Need Statement is deficiently based on outdated social and environmental considerations, and that it failed to take into account public comments. Again, the record rebuts this challenge. In the Supplemental Final EIS, the Defendants reevaluated the Final EIS's Purpose and Need Statement to ensure that the Project's

---

[11] The Supplemental Final EIS's Purpose and Need Statement affirms the Final EIS's Purpose and Need Statement, which itself is based on the ORMIS. In the development of the Supplemental Final EIS, Defendants engaged in a re-analysis of the Project's purpose and need, incorporation new traffic forecasting modules, which confirmed that the purpose and need as expressed in the Final EIS remained valid.

[12] The FHA implemented Executive Order 12898 in issuing FHA Order 6640.23. Individuals have no private right of under Executive Order 12898. *See* Exec. Order No. 12898 at 6-609. Correspondingly, there is no private right of action under FHA Order 6640.23. As such, this component of Claim 14 is dismissed as a matter of law.

objectives remained the same in light of new information. Defendants did not merely re-adopt their previous finding; rather, Defendants conducted a comprehensive reassessment of the Project's purpose and need to determine whether the previous Purpose and Need Statement remained valid. Additionally, Defendants made available to the public the Supplemental Final EIS's Purpose and Need Statement before the FHA issued the Revised ROD. Thus, Defendants complied with the procedural mandates of NEPA and allowed for public review and comment.

For all these reasons, the Court concludes that Defendants did not act arbitrarily or capriciously in defining the Project's Purpose and Need Statement. Accordingly, Claims 14 and 20 are dismissed.

## C.

### Claims 3 & 9: Reasonable Alternative Analysis

CART brings two claims that specifically question the adequacy of Defendants' consideration of reasonable alternatives to the Modified Selected Alternative. In Claim 3, CART alleges that Defendants' decision to implement tolls on the East End and Downtown Crossings for 46 years is not in the public's best interest in violation of 40 C.F.R. § 1502.14(a) and 23 C.F.R. § 771.105(b). Specifically, CART contends that Defendants did not adequately evaluate the social, economic and environmental impacts, including impacts to Title VI populations, when approving 46 years of tolling, and as such, the decision to do so is deficient. In Claim 9, CART alleges that Defendant violated 40 C.F.R. § 1502.14(a) and 23 U.S.C. § 109(h) by failing to sufficiently explore the option of constructing a non-tolled alternative of an East End Crossing with low cost traffic management.

In its EIS, an agency must discuss reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). The alternative analysis demands that an agency give "a balanced consideration" of transportation and safety factors, environmental impacts, and the local, state and national environmental protection goals. 23 C.F.R. § 771.105(b).[13] Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for the alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

In drafting its EIS, an agency "must make the initial determination [of] which alternatives are feasible and merit consideration."[14] *Com. of Ky.* ex rel. *Beshear v. Alexander*, 655 F.2d 714, 718 (6th Cir. 1981); *see Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 377 (6th Cir. 2010) (noting that the range of alternatives an agency must address is within its discretion). Thus, the agency "need not consider all of the possible alternative actions in the EIS; it is only required to look at those that are reasonable in light of the project's stated purpose." *Alliance for Legal Action v. F.A.A.*, 69 F. App'x. 617, 622 (4th Cir. 2003); *see Dalton*, 989 F. Supp. at 1326 (noting that when "alternatives are [identified and] evaluated in reasonable depth, an agency is free to make any non-arbitrary choice among them").

Again, the action's Purpose and Need Statement informs the range of alternatives an agency must consider. *See Audubon Naturalist*, 524 F. Supp. 2d at 667 (stating that courts are to "evaluate the agency's choices of reasonable alternatives in light of the objectives and goals of the federal action") (internal quotation omitted). Thus, given the purpose of the proposed action,

---

[13] Similarly, 23 U.S.C. § 109(h) provides in part that the agency must submit the proposed project to Congress with assurances "that the final decisions on the project are made in the best overall public interest."

[14] Indeed, the NEPA statutory scheme provides for two discrete phases of alternative analyses. "First, the agency must choose from the universe of options a list of alternatives as 'finalists' that it will study in detail. Second, the agency engages in a more rigorous environmental analysis of these selected finalists before making its ultimate decisions." *Surfrider Found. v. Dalton*, 989 F. Supp. 1309, 1325 (S.D. Cal. 1998).

courts must determine whether the agency identified a reasonable range of alternatives, and whether the agency aptly explored each.  *Id.*  As previously stated, a court's review is limited and entitled to some deference.  *See id.* ("[T]he Court's review is not of the agency's substantive judgment, but of the sufficiency of the agency's consideration of the reasonable alternatives.").

Given the Project's Purpose and Need Statement, the Court holds that Defendants considered an adequate number of reasonable alternatives and investigated them to the extent necessary in accordance with NEPA.  In two distinct NEPA reviews, Defendants identified five alternatives and measured their relative ability to satisfy the Project's purpose and need.  These alternatives encompassed a wide array of potential transportation-related measures including building a new crossing, reconstructing existing infrastructures, implementing alternative transit options and alleviating traffic congestion with various benefit programs.  Eventually Defendants properly narrowed the range of alternatives for further analysis.  *See id.* at 668 ("Agencies may properly eliminate from further study those alternatives that do not meet its reasonable objectives.").  The Bridge/Highway Alternatives consisted of a permutation of one- and two-bridge solutions, as well as various methods of financing.

With respect to Claim 3, in its evaluation of alternatives, Defendants took a hard look at the likely impacts of tolling, including the impact of the tolling period on low income and minority populations.  Defendants are not required to select the most benign alternative, but must take a hard look at environmental, social and economic impacts in its consideration of alternatives.  The Court is satisfied Defendants met this burden.[15]

---

[15] It is worth noting that NEPA imposes on federal agencies a continuing duty to supplement the EIS in the face of new information that significantly bears on the chosen action.  40 C.F.R. § 1502.9(c).  As such, Defendants must periodically reassess the need and extent of tolling, and perhaps, as a result, reengage in some of the NEPA processes.

Concerning Claim 9, the Administrative Record includes a discussion of a Downtown Crossing-only alternative and an East End Crossing-only alternative. Defendants declined to pursue a single-bridge alternative because it would not achieve the Project's long-term objective to improve overall cross-river mobility. Specifically, in the Alternatives Evaluation Report, Defendants found that a non-tolled, single-bridge alternative would not meet the Project's purpose and need, and therefore, a further in-depth analysis of that alternative was unnecessary. In that decision, and in overall reasonable alternative analysis, Defendants adequately considered the impacts to Title IV populations. While CART is entitled to disagree with Defendants' decision to adopt the Modified Selected Alternative, NEPA does not control the agency's choice among alternatives. Rather, it only requires that the agency consider and disclose to the public reasonable alternatives and their evaluation thereof. Given the deferential standard of review the Court must apply, the Court finds that Defendants gave due evaluation to a reasonable range of alternatives. As a result, the Court must dismiss Claims 3 and 9.

D.

Claim 7: Pre-selection of the East End Crossing

In Claim 7, CART argues that Defendants violated 40 C.F.R. §§ 1500.1(b) and 1507.1 when they allegedly "pre-selected" the route for the East End Crossing before disclosing its environmental impact. CART alleges that Defendants contracted with the Soterion Corporation to select the particular East End Crossing location. As a result, according to CART, Soterion Corporation purchased land in the area in February 2000 for $2.9 million and years later sold it to Kentucky for a $5.4 million profit.

To the extent that CART's claim alleges fraud or bad faith, the Court dismisses that contention outright. CART's allegations to this end are vague and unsubstantiated. NEPA documents refute this accusation by evidencing a very thorough and collaborative process of weighing alternatives and making a reasoned choice. The selection of the East End Crossing location resulted from a lengthy and rigorous deliberation process. Persistent speculation of a new bridge in East Louisville likely suggested the possibility that Kentucky might someday seek to purchase the property for the Project. However, CART fails to advance any allegations from which the Court could infer that the specific bridge location was pre-selected. The Court finds that Defendants engaged in a well-reasoned selection process and fulfilled its obligations under NEPA in that respect. Thus, Claim 7 is dismissed.

E.

Claim 8: Anticipated Tunnel Spoilage

In Claim 8, CART contends that the Supplemental Final EIS is defective because it fails to adequately address the placement and disposal of an estimated 350,000 tons of material excavated from the tunnel leading to the Kentucky entrance of the East End Crossing. CART maintains that this issue is "significant" for purposes of NEPA, *see* 40 C.F.R. § 1508.27, and Defendants' failure to rigorously review and disclose the environmental impact of tunnel spoil violates 40 C.F.R § 1500.1(b).

The Revised ROD discusses the issue of excavated tunnel spoil and states that "[a]ll excavated materials not utilized for roadway embankment or disposed of off-site will be hauled for storage to an upland site and secured in such a manner as to prevent runoff from entering streams." Revised ROD, at 46. Further, Defendants conceded that "[b]orrow sites and excess

material sites for disposal of construction spoil have not been determined at this time. Excess material and borrow sites will be investigated later when a determination is made on how construction phasing will progress." *Id*. CART argues that such a concession violates the NEPA requirement for concurrent review of environmental impacts in NEPA disclosures. *See* 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").

Nothing in the Administrative Record suggests that Defendants discounted the impacts of tunnel spoil. Rather, Defendants acknowledged the environmental impact of tunnel spoilage and have proffered several ideas to properly manage excess. That Defendants have not precisely determined a site for disposal of excess construction spoil does not invalidate their analysis. The sites will be investigated further when contractors decide on the schedule of construction; presently, Defendants have committed to coordinate with U.S. Fish and Wildlife Service when sites are identified, and have required contractors to develop plans detailing methods to transport and partition the excavated materials. Lastly, contractors are charged with creating restoration plans for excess material not used in the Project.

The Court finds that Defendants have addressed the issue of tunnel spoilage to the most practical degree at this stage in the Project. The Administrative Record evidences that Defendants took the required hard look at the issue of spoilage excavation and have made arrangements that seem reasonable at this point. Accordingly, Claim 8 is dismissed.

Claim 17: Second Supplemental EIS

Finally, in Claim 17, CART contends that Defendants violated NEPA when they failed to prepare a second supplemental EIS after the Project's construction cost projection allegedly dropped from $4.1 billion to $1.6 billion.  In December 2012, the bridge contractors reduced the cost projections for the construction of both bridges.[16]  As best the Court can conceive, CART argues that the reduction in cost projections, and thus the reduced apparent need for tolls as a revenue source, should alter the balance previously struck supporting the propriety of tolls when compared to the anticipated, yet undetermined, disparate impact the tolls might have on environmental justice populations, defined here as minority and low income populations.  By failing to conduct a revised EIS pursuant to the new cost projections, CART contends that Defendants violated 40 C.F.R. § 1502.9(c)(1)(i)-(ii) and 5 U.S.C. § 706(2)(A).

Once an EIS is finalized, "an agency need not supplement [it] every time new information comes to light."  *Marsh*, 490 U.S. at 373.  However, the agency must supplement when it "makes substantial changes in the proposed action that are relevant to environmental concerns[,]" 40 C.F.R. § 1509.9(c)(1)(i), or where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1509.9(c)(1)(ii).  The decision of whether to prepare a supplemental EIS

> turns on the value of the information to the still pending decisionmaking process.  In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance:  If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the

---

[16] CART also argues that Defendants promised to conduct a detailed assessment of the potential economic effects of tolls on Title VI populations in light of the new cost projections; however, CART notes that the Project will be built before Defendants can understand the significance of disparate impacts on minority populations or meaningfully explore mitigation alternatives.

> human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Marsh*, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)). An agency's determination of whether the information is significant enough to require supplementation is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Id.* at 376. An agency's analysis of new information "requires a high level of technical expertise," and as such, courts "must defer to 'the informed discretion of the responsible federal agencies.'" *Id.* at 377 (quoting *Kleppe*, 427 U.S. at 412)).

CART alleges that a press release announcing the selection of bridge contractors stated that the overall cost of the Project was $1.6 billion. This is not a fair statement. The $1.6 billion figure represents the cost projections of the two primary construction contracts for the East End and Downtown Crossings; the figure does not represent the entire cost of the Project. Many other costs are involved such that the actual estimated total cost is $2.6 billion. Prior to the bids, the 2012 IFP estimated that the two primary construction contracts as costing $1.9 billion. Thus, the contractor bids will result in savings of $300 million, not the more than $2 billion that CART alleges. Therefore, the change in cost is not significant.

The maximum funding available from traditional federal and state sources remains $1.9 billion. Since the Project's estimated total cost is $2.6 billion, there remains a significant need for toll-based revenue to fund the Project. The Court is satisfied that the financial data and reasoning in the Supplemental Final EIS and Revised ROD remain valid. Defendants have made a reasonable judgment that the $300 million reduction does not reduce the total Project's cost sufficiently enough to demand that Defendants reconsider the need for tolling.

For these reasons, the Court finds that the Defendants' decision not to prepare a second supplemental EIS was not arbitrary or capricious, and as such, Claim 17 must be dismissed.

IV.

The next group of claims broadly attack Defendants' financial planning and funding selection for the Project. Once again, the Court concludes that Defendants have considered numerous funding alternatives and have made reasonable decisions concerning financing for the Project.

A.

Claim 2: Tolling on the Downtown Crossing

Claim 2 concerns the Toll Agreement, which approved federal financial assistance for the Project.[17] Generally, FAHA prohibits the implementation of tolls on highways constructed with federal aid or assistance. 23 U.S.C. § 301. However, the Secretary of Transportation may authorize toll projects involving 1) the initial construction of non-interstate toll highways, bridges and tunnels, and 2) the reconstruction or replacement of existing free interstate and non-interstate bridges and tunnels. *See* 23 U.S.C. § 129(a). The Toll Agreement designates the East End Crossing and Downtown Crossing as toll facilities pursuant to 23 U.S.C. § 129. In Claim 2, CART argues that tolling cannot be authorized on the Downtown Crossing because it does not meet one of the exceptions to 23 U.S.C. § 301 provided for in 23 U.S.C. § 129(a). [18]

---

[17] Recipients of federal financial assistance for "major projects", defined as projects with an estimated total cost of $500 million, are required to prepare a project management plan, which documents "the procedures and processes that are in effect to provide timely information to the project decisionmakers to effectively manage the scope, costs, schedules, and quality of, and the Federal requirements applicable to, the project; and the role of the agency leadership and management team in the delivery of the project." 23 U.S.C. § 106(h). It is not disputed that the Project is a "major project" as defined in 23 U.S.C. § 106(h)(1), as the estimated total cost exceeds $500 million. The Project's project management plan is memorialized in the Toll Agreement.

[18] The parties do not dispute that the East End Crossing qualifies as a project for the initial construction of a non-Interstate bridge pursuant to 23 U.S.C. § 129(a)(1)(A).

The Downtown Crossing has two dependent bridge components: the Kennedy Bridge, which will be reconstructed and reconfigured to carry only I-65 southbound traffic, and a new parallel I-65 crossing, which will be constructed to carry only I-65 northbound traffic. Together, the bridges comprise parallel crossings for all cross-river I-65 traffic. In the Court's view, this part of the Project merely alters and expands an existing, open traffic pattern. It does not create a new traffic pattern previously unavailable.

Under FAHA, federal assistance may be provided for the "reconstruction or replacement of a toll-free bridge or tunnel and conversion of the bridge or tunnel to a toll facility." 23 U.S.C. § 129(a)(1)(E). The Toll Agreement is based upon a sound and reasonable conclusion: the parallel I-65 crossing is not an initial construction of an interstate bridge, but rather a component in the reconstruction of the existing I-65 crossing. *See* Toll Agreement, at 2. The Downtown Crossing is a comprehensive, reconstruction project of the existing I-65 crossing, and thus eligible for conversion to a toll facility under 23 U.S.C. § 129(a)(1)(E). As a result, Claim 2 must fail.

B.

Claim 5: Approval of the Financial Plan

Next, CART alleges that the use of tolls to finance the Project violates the fiscal constraint requirement imposed under 23 U.S.C. § 134(j)(3)(D) and 23 U.S.C. § 135(g)(5)(E). Both provisions demand, as a condition of federal participation in a proposed transportation project, that "full funding can reasonably be anticipated to be available for the project within the time period contemplated for completion of the project."[19] Because the Project has a 2018

---

[19] The region's metropolitan planning organization, the Transportation Policy Committee of the Kentuckiana Regional Planning and Development Agency ("MPO"), makes the determination of whether a project meets this fiscal constraint requirement. 23 U.S.C. § 134(c). The MPO is charged with preparing and updating the region's

anticipated completion date, CART argues that the 46-year-toll period indicates full funding is unavailable.

The Court finds no common sense or legal support for such an argument. The Project's mixed funding, ranging from federal financing to debt financing, is common for such complex construction projects. Since part of the Project's funding is debt financing, a future obligation is created that is outside the Project completion schedule. Toll revenue, among other purposes, helps to ensure that future debt payment obligations can be met. Simply because present day funding is subject to amortization is no basis to conclude that full funding is unavailable for the Project. The Court finds that Defendants have presented an adequate plan to fully fund the Project. As a result, Claim 5 cannot go forward.

## C.

### Claims 4 & 6: Failure to Include Detailed Cost Estimates of the Project

Claims 4 and 6 allege that Defendants' financial disclosures lack transparency and detailed explanations in violation of FAHA. Pursuant to 23 U.S.C. § 106(h), recipients of federal assistance for "major projects" must prepare and submit two financial plans, a project management plan (here, the Tolling Agreement) and a financial plan (here, the IFP). The IFP must be based on "detailed estimates of the cost to complete the project." 23 U.S.C. § 106(h)(3)(A).[20]

---

long-term transportation plan ("Horizon 2030") and short-term transportation plan ("Transportation Improvement Program"). Both plans must be fiscally constrained. *See* 23 U.S.C. § 134(j)(3)(D)(fiscal constraint requirement for long-term plan) and 23 U.S.C. § 135(g)(5)(E)(fiscal constraint requirement for short-term plan). The MPO found both Horizon 2030 and the Transportation Improvement Program to be fiscally constrained. Those plans have been amended to include the Modified Selective Alternative.

[20] This statutory language does not impose the same requirement, to base the plan on detailed estimates of the cost to complete the project, on the Tolling Agreement. To the extent that CART alleges that the Tolling Agreement violated the mandate in 23 U.S.C. § 106(h)(3)(A) that financial plans be based on detailed estimates of the cost to complete the Project, the Court dismisses such allegations as a matter of law.

The 2012 IFP memorializes Defendants' financial plan, providing a detailed Project cost estimate and an explanation of its methodology consistent with the Project's construction schedule. Further, the IFP provides an in-depth overview of the Project's available and committed funding, as well as projected toll-based revenues. Lastly, it discusses risks associated with the Project's costs, scheduling and funding, and supplies a summary of potential mitigation strategies to address each.

In Claim 4, CART argues that the IFP's cost-to-complete estimates improperly rely upon speculative toll revenues and governmental appropriations. The substance of the IFP, however, refutes this charge. An entire section is devoted to risk identification, including future availability of state and federal funding and toll-based revenue. It squarely addresses risks that may affect the ability to finance the Project, including the operation and maintenance of the Project over time. For each identified risk, the IFP provides a corresponding mitigation plan to address the particular contingency should it arise. Though CART may not agree with these plans or believe them to be adequate, Defendants easily met the applicable FAHA requirements.

In Claim 6, CART alleges that Defendants failed to explain $214 million in oversight costs. Once again, the IFP defeats this assertion. It details the allocation of oversight and design costs provided for during Project construction, including the hiring and support of experts. Given the Project's size, the need for oversight is obvious, at the very least to promote public confidence in its integrity. Taken as a whole, the IFP provides an exhaustive account of the Project's financial considerations. The Court finds no reasoned or legal basis for questioning the oversight costs.

While CART is entitled to believe the IFP lacks sufficient detail to satisfy 23 U.S.C. § 106(h)(3)(A), the Court does not reach the same conclusion. Defendants' analysis is neither arbitrary nor capricious. The Court finds the IFP to be sufficiently detailed, and in compliance with 23 U.S.C. § 106(h)(3)(A). Consequently, the Court must dismiss Claims 4 and 6.

V.

CART's next group of claims assert broad allegations that Defendants failed to comply with various water, air, and other environmental quality standards. For the reasons that follow, the Court concludes that Defendants have adequately considered and addressed all required environmental concerns in its development of the Project.

A.

Claims 10 & 11: Clean Water Act

In 1972, Congress amended the Federal Water Pollution Control Act with the CWA to provide the structure for regulating pollutants from point sources that may contaminate bodies of water within the United States. In furtherance of that goal, the CWA permits individuals to bring lawsuits to enforce the Act against the government pursuant to its citizen suit provision, 33 U.S.C. § 1365. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987). Necessarily, a major infrastructure project such as this one implicates CWA regulations. Claims 10 and 11 allege direct and indirect violations of the CWA.

i.

As a preliminary matter, the Federal Defendants argue that § 1365 of the CWA allows only a limited waiver of sovereign immunity to bring citizen suits against the government. They

maintain that that CART failed to adhere to the jurisdictional prerequisites necessary to bring CWA claims imposed in § 1365. The Court agrees.

First, the CWA allows for citizen suits for alleged violations of "(A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). Therefore, the CWA authorizes citizens to seek civil penalties "only in a suit brought to enjoin or otherwise abate an ongoing violation." *Atl. States Legal Found., Inc. v. United Musical Instruments, U.S.A., Inc.*, 61 F.3d 473, 476 (6th Cir. 1995) (quoting *Gwaltney*, 484 U.S. at 59). However, CART alleges no ongoing violation in its complaint; at the time CART filed its complaint, construction of the Project had not yet commenced and no agency had issued water quality permits for the Project. The allegations of excessive pollution were purely speculative. Accordingly, CART's claims under the CWA are not actionable at this time.

Second, the CWA requires a citizen to provide notice of the alleged violation to the Environmental Protection Agency ("EPA"), the state in which the alleged violation occurs, and any alleged violator, sixty days prior to filing a complaint. 33 U.S.C. § 1365(b). This is not a mere technicality. The purpose of the notice requirement "is to give [the alleged violator] an opportunity to bring itself into complete compliance with the Act and thus . . . render unnecessary a citizen suit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 175 (2000) (quoting *Gwaltney*, 484 U.S. at 60). CART concedes it did not timely provide such notice.[21] However, CART argues against strict enforcement of this requirement for two principal reasons: 1) Defendants had notice of the claims by virtue of the NEPA process, and

---

[21] CART served Defendants with a letter of notice contemporaneously with the initial complaint on September 4, 2012 and failed to provide any notice whatsoever to the EPA and the Kentucky Division of Water.

2) the agreed order requiring CART to file its complaint within 30 days of the order prevented its ability to file timely notice.

Neither of these reasons persuades the Court to ignore the CWA notice requirement. The Sixth Circuit has interpreted the CWA notice requirement to be a "jurisdictional prerequisite to recovery under the [CWA]." *Bd. of Trs. of Painesville Twp. v. City of Painesville,* 200 F.3d 396, 400 (6th Cir. 1999). The Supreme Court has strictly enforced a substantially similar jurisdictional notice provision. *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 24 (1989) (holding that the notice provision in the Resource Conservation and Recovery Act plainly mandated strict compliance).[22] These cases confirm that parties cannot waive the notice requirement, and this Court should apply it strictly. Therefore, CART's failure to comply with the jurisdictional prerequisites of the CWA citizen suit provision mandates dismissal of its CWA claims.[23]

The Court concludes that CART failed to perform the mandatory conditions precedent to commencing a separate action under the CWA's citizen suit provision. Therefore, Defendants' sovereign immunity bars CART's CWA claims.[24]

ii.

This does not end the inquiry into Claims 10 and 11, because CART also alleges NEPA and APA violations in each. In Claim 10, CART asserts that Defendants violated NEPA by

---

[22] The Resource Conservation and Recovery Act citizen suit provision, 42 U.S.C § 6972(b), discussed in *Hallstrom* is identical to the CWA notice provision contained within 33 U.S.C. § 1365(b)(1)(A), absent the CWA notice exceptions in 33 U.S.C. § 1365(b)(2). None of these exceptions apply to the case at bar.

[23] Arguments that this Court has jurisdiction over the CWA claims under other statutes are unavailing. The federal facilities provision, 33 U.S.C. § 1323, does not provide this Court jurisdiction over these claims in light of the Sixth Circuit's holding in *Board of Trustees of Painesville Township,* that the "citizen suit provision of the CWA is the exclusive jurisdictional avenue for private plaintiffs and eliminates all other implied rights." 200 F.3d at 400 (quoting *Walls v. Waste Res. Corp.*, 761 F.2d 311, 316 (6th Cir. 1985)) (internal punctuation omitted). The general supplemental jurisdiction provision, 28 U.S.C. § 1367, also does not cure CART's jurisdictional deficiencies, as that provision does nothing to overcome Defendants' sovereign immunity or create a private right of action to sue under the CWA.

[24] CART may have in fact abandoned its CWA claims, as can be inferred from the scant discussion in its response to the motion for judgment on the pleadings, *see* ECF No. 178, 12-13, and its failure to argue CWA violations in its subsequent briefings concerning Claims 10 and 11.

failing to model or calculate reasonably foreseeable adverse environmental impacts from discharged concentrations of certain toxins and by failing to take a hard look at present environmental impacts of highway pollutants. Additionally, CART contends that Defendants' selection of best management practices for water quality protection was arbitrary and capricious.[25] Claim 11 advances CWA allegations that Defendants failed to adequately analyze the impacts of highway chemical discharge into Harrods Creek and failed to provide accurate maps or identify locations of significant discharges in the Wellhead Protection Area, all in violation of 40 C.F.R. §§ 1502.16 and 1502.22(b). CART also more generally contends that Defendants failed to model and investigate potentially catastrophic contamination of the Wellhead Protection Area in violation of NEPA.

The Administrative Record clearly rebuts these charges as the Project's environmental analyses show that Defendants took a hard look at the Project's potential impacts on water quality in both Harrods Creek and in the Wellhead Protection Area. *See, e.g.*, Final EIS, at 4-182–201. The Supplemental Final EIS includes careful considerations of potential mitigation measures and proposals for ensuring that the Project's final design will protect water resources in the Project area. *See* Supplemental Final EIS, at 5-214–5. The Administrative Record also indicates that these conclusions do not derive from stale information: the Supplemental Final EIS references numerous factors contributing to its conclusions beyond studies from 1997, including various pollution investigations pertaining to the Project-area water sources from more recent years. *See, e.g.*, Supplemental Final EIS, at 5-229–231. The Court finds that Defendants' analyses of the significant environmental impacts on water quality amounted to a hard look as

---

[25] CART also claims that Defendants violated 23 C.F.R. § 177.133, a regulation that does not appear to exist. If CART mistyped the regulation, the Court cannot find the proper regulation to which CART was referring based on the allegations. Additionally, in subsequent briefings, CART did not curb the confusion. Accordingly, this claim must fail.

mandated by NEPA and were therefore reasonable for purposes of the APA. Accordingly, Defendants are entitled to summary judgment on those claims.[26]

B.

Claims 12 & 13: Clean Air Act

CART also alleges several CAA violations. This statute outlines a joint federal and state program for protecting and improving air quality and the stratospheric ozone layer. Initially, CART asserted claims under the CAA, NEPA and the APA. After reviewing the relevant law, however, CART withdrew its allegations that this Court maintained jurisdiction over the CAA claims pursuant to the citizen lawsuit provisions within the statute.[27] In Claim 12, the remaining NEPA and APA claims are as follows: Defendants failed to take a hard look at environmental impacts by neglecting to evaluate existing incidence of respiratory illness disproportionately afflicting low income minorities, especially because of concentrations of ultrafine particulates; Defendants' air quality impact analyses are unreliable and speculative as they fail to properly account for nano-particle counts of pollutants; and Defendants' decision to perform the hot spot analyses with the MOBILE 6.2 computer model was arbitrary and capricious. In Claim 13, CART further alleges that Defendants violated NEPA's hard look obligation in conducting its conformity analyses when it failed to account for the concentration of ultrafine particulates.

Defendants argue that their only duty under NEPA concerning analysis of air quality impacts is to follow CAA guidelines. The CAA requires that certain transportation projects

---

[26] In these claims, CART also contends that Defendants either prematurely instituted the NEPA process or delayed filing for water quality permits to avoid public discussion of practicable alternatives, required under the CWA, and to preclude a hard look at those water quality issues that would necessarily surface as a result of the CWA permit application process. Because CART asserts similar allegations in other claims in its complaint, the Court will address the substance of these arguments in Section D of this Part of the Memorandum Opinion.

[27] For this reason, the Court will sustain the Federal Defendants' motion for judgment on the pleadings as to the CAA claims.

38

comply with its policy and regulatory goals.[28] Accordingly, Defendants must make conformity findings for the Project at the regional level and the project level.[29] The Administrative Record shows that Defendants performed the required CAA conformity analyses. Defendants assert that because of this, they satisfied their burden under NEPA by ensuring conformity with the State Improvement Plan, Horizon 2030, the Transportation Improvement Plan, and the hot spot analysis requirements. *See, e.g.*, Supplemental Final EIS, at 4-145–152. While CART seems to concede that Defendants properly performed these analyses, it argues that Defendants should have done more than what the CAA framework requires and investigated the impacts of ultrafine particulates.

CART has not identified any requirement under the CAA or elsewhere mandating the examination of ultrafine particulates. The NAAQS only determine the national standards for fine particulate, and the record evidences that Defendants studied this matter. *See* Supplemental Final EIS, at 4-148. In addition, the CAA requires detailed and demanding conformity analyses

---

[28] Pursuant to the CAA, the EPA establishes national ambient air quality standards ("NAAQS") to protect the environment from six principal air pollutants, called criteria pollutants. It designates certain regions that do not meet the NAAQS for particular pollutants as in nonattainment status. During the period when Defendants underwent the NEPA process, the Louisville Metropolitan area was in nonattainment status for some criteria pollutants.

[29] In *Audubon Naturalist*, Judge Alexander Williams, District Judge for the District of Maryland, provided a thorough description of how the CAA operates in the context of a federally assisted transportation program in a nonattainment area. 524 F. Supp. 2d at 692-94. The following summarizes his conception of the CAA as applied to the present situation: First, at the regional level, the States must generate a State Implementation Plan to attain and maintain NAAQS for each criteria pollutant in that state. The EPA receives the state submission, and if appropriate, issues approval of the State Implementation Plan. Next, the MPO must generate long-term transportation plans designed to improve current and future travel (here, Horizon 2030) and short-term transportation improvement programs describing individual projects designed to implement the transportation plan (here, Transportation Improvement Program). Both plans must be submitted to the FHA and the Federal Transit Administration "to ensure the transportation-related decisions are consistent with the purposes of the applicable [State Improvement Plan]." *Id.* at 693. Any updates or changes to Horizon 2030 or the Transportation Improvement Plan must also conform to the State Improvement Plan to ensure that these plans continue to promote the attainment or maintenance of NAAQS. In May 2002, the MPO amended Horizon 2030 and the Transportation Improvement Plan to include the Modified Selected Alternative, determining they are consistent with the State Improvement Plans in Kentucky and Indiana. The FHA approved the conformity determination.

Second, new or expanded highway projects must be subject to a conformity analysis at the project level, where the project must comply with the transportation plan, the transportation improvement program, and meet "hot spot" analysis requirements. Hot spot analyses are devised to determine the transportation project's impact on future localized pollutant concentrations and to compare those concentrations to the relevant NAAQS.

of critical impacts to air quality as defined by the EPA, an agency with considerable expertise and institutional knowledge on the subject. The Court concludes that performing and completing the conformity analyses described in the CAA satisfies Defendants' hard look requirements for air quality issues under NEPA, and Defendants completed this task. *See* Supplemental Final EIS, at 4-145–152. The regulatory framework does not require specific consideration of ultrafine particulates, so Defendants' failure to conduct a thorough investigation of this matter is excused. Defendants' consideration of air pollution issues was reasonable.

Finally, Defendants contend, and CART does not dispute, that the EPA permitted the use of MOBILE 6.2 and MOVES to perform emissions analyses commenced before December 20, 2012. *See* Revised ROD, at 77; EPA Notice of Availability, 75 Fed. Reg. 79370-07 (Dec. 20, 2010) ("EPA is approving the latest version of the MOVES model . . . for official use for . . . hot-spot analyses . . . . This notice also announces a two-year grace period before the MOVES2010a emissions model is required to be used in quantitative CO and PM hot-spot analyses for project-level conformity determinations outside California."). That the EPA permitted the use of the MOBILE 6.2 model during the time at issue supports its reasonableness. Agencies are entitled to select their own reasonable methodologies, which supports the conclusion that Defendants' decision to use the MOBILE 6.2 model was not arbitrary and capricious. *See BP Exploration & Oil, Inc. v. United States Envtl. Prot. Agency*, 66 F.3d 784, 792 (6th Cir. 1995). Accordingly, the Court finds that Defendants' decision in this regard does not violate NEPA or the APA.

For these reasons, the Court will dismiss Claims 12 and 13.

Claim 16: Greenhouse Gas Emissions

In Claim 16, CART alleges that Defendants purposely withheld from the NEPA process certain greenhouse gas emission findings, improperly dismissed EPA comments, and mislead the public about the extent of greenhouse gas emissions likely to result from the Project, all in violation of 40 C.F.R. §§ 1502.1. -.16 and 42 U.S.C. § 4332(C).

In the Environmental Chapter of the Supplemental Final EIS, Defendants discuss the Project's environmental impact in conjunction with greenhouse gas emissions and climate change. Supplemental Final EIS, at 5-139. Defendants, citing *Massachusetts v. United States Environmental Protection Agency*, 549 U.S. 497 (2007), emphasize that "while [greenhouse gas] emissions are now subject to regulation by the [EPA], the [EPA] regulations do not directly affect the requirements applicable to the development of transportation projects." *Id*. Defendants do acknowledge the global significance of climate change but conclude that an in-depth study on area-specific increases in greenhouse emissions would be futile. Their reasoning is compelling: "The climate impacts of [greenhouse gas] emissions are global in nature. Analyzing how alternatives evaluated in an EIS might vary in their relatively small contribution to a global problem will not better inform decisions." *Id*. Defendants do commit to work "with the DOT Center for Climate Change to develop strategies to reduce transportation's contribution to [greenhouse gas emissions] . . . and to assess the risks to transportation systems and services from climate change." *Id*.

CART fails to proffer any evidence, in the form of regulatory mandates or national environmental standards, to suggest that the failure to analyze greenhouse emissions under

41

NEPA renders a Supplemental Final EIS or Revised ROD arbitrary or capricious. *Sierra Club*, 715 F. Supp. 2d at 741 (holding that, in the absence of an regulatory mandate, an agency's failure to consider greenhouse gas emissions was not arbitrary or capacious and did not render the Final EIS inadequate); *N.C. Alliance for Transp. Reform v. U.S. Dep't of Transp.*, 713 F. Supp. 2d 491, 521 (holding that agency's decision to not evaluate greenhouse gas emissions in the EIS did not violate NEPA).

Although consideration of greenhouse gas emissions is patently important, the Court agrees that Project-specific quantification of greenhouse gas emissions, and their effect on climate change, would be largely uninformative and speculative. The Court is satisfied that the Defendants took a hard look at environmental impacts and was not arbitrary or capacious in concluding that a Project-level analysis of greenhouse gas emissions would not be useful in the NEPA process. Accordingly, the Court must dismiss Claim 16.

## D.

### Claims 18 & 19: Water Quality Disclosures

Claims 18 and 19 both challenge the Supplemental Final EIS on grounds that Defendants improperly applied for CWA Section 401 Water Quality Certification ("Section 401 application") for the East End Crossing after completing the Supplemental Final EIS and issuing the Revised ROD, in violation of 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1502.24. CART contends that Defendants purposely delayed filing the Section 401 application so that certain disclosures required for Section 401 application approval would not be discussed in the Supplemental Final EIS, thus rendering it inadequate.[30]

---

[30] Foremost, CART fails to proffer any allegation above mere speculation that Defendants acted in bad faith by delaying their Section 401 application. As a result of the "presumption of regularity [that] attaches to the actions of

Specifically, Claim 18 alleges that the Section 401 application discloses the construction of a massive spoil embankment and two 10,000 gallon storm water storage vaults with discharge outlets to Harrods Creek. CART argues that these revelations raise concerns about the possibility of de-icing pollutant contaminating Harrods Creek and other water resources. In addition, CART asserts that Defendants violated NEPA by excluding relevant stream monitoring findings, which demonstrate the likelihood of chloride runoff into Beargrass Creek caused by de-icing activities. In Claim 19, CART contends that Defendants deliberately excluded the final location of bridge piers, thus bypassing NEPA's mandate that agencies take a hard look at the environmental impacts of project construction to a specific locale.[31]

In essence, these claims challenge the adequacy of Defendants' analyses of environmental impacts in the Supplemental Final EIS under NEPA standards. *See* 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.24. Contrary to CART's position, Defendants do not appear to have excluded various considerations of significant environmental impacts from the Supplemental Final EIS. For instance, Defendants did discuss and analyze the potential impact of de-icing fluids and tunnel excavation drilling fluids. *See* Supplemental Final EIS, at 5-211. Additionally, the Supplemental Final EIS suggests several mitigation strategies aimed at alleviating the effect of de-icing and drilling runoff that could potentially contaminate aquatic habitats. *Id.* The Court is satisfied that Defendants conducted a thorough analysis of potential environmental consequences of the Project and therefore, the Court concludes that Defendants

---

Governmental agencies," the Court dismisses the claims to the extent that they are predicated on assertions of bad faith. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).

[31] As a threshold matter, the Court finds compelling Defendants' argument that CART bases these claims on extra-record evidence, and since CART has not met its burden of establishing that the Administrative Record demands supplementation, the Court should dismiss the claims outright. Additionally, the sort of challenges advanced in Claims 18 and 19 may be more appropriate in a separate action against the Kentucky Division of Water, the body charged with evaluating the information within the Section 401 application. *See* 5 U.S.C. §§ 704, 706. However, as alluded to before, the Court wishes to address all the claims in a substantive way to ensure a final decision on this important public matter.

took a hard look at impacts of bridge construction on the environment, including Harrods Creek and other water resources. Consequently, the Court will dismiss Claim 18.

As to Claim 19, the Court has already concluded that Defendants analyzed a reasonable range of alternatives in selecting the Modified Selected Alternative. Several of the alternatives considered alignments that would span Harrods Creek and thus, not require pilings or piers. However, after testing each alternative against the Project's purpose and need, the Court finds that Defendants reasonably selected a proposal that will require such a structure. Again, the Court is not in the position to opine on the propriety of the final selection. Rather, the Court need only ensure that Defendants considered a reasonable range of alternatives. As found in Section C of Part III, the Court is satisfied that Defendants met this burden. Accordingly, the Court will dismiss Claim 19.

## VI.

As a general matter, CART alleges that various elements of the Project violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[32]  Congress enacted Title VI to "halt federal

---

[32]    CART also appears to bring a discrimination claim for violation of the Equal Protection Clause under 42 U.S.C. § 1983 in two separate paragraphs of its complaint. First, in the fact section, CART asserts that "CART Plaintiffs also bring this action pursuant to 42 U.S.C. § 1983 for injuries to CART's protected low income and African American minority class members who were and are the target of purposeful, invidious discrimination on the basis of race, by the approval of the SFEIS and RROD, in violation of the Equal Protection Clause of the Fourteenth Amendment, Section 601 of Title VI of the Civil Rights Act of 1964." ECF No. 124. Second, in the jurisdictional section of the complaint, CART asserted that this Court "has jurisdiction over the subject matter of this action pursuant to . . . 42 U.S.C. § 1983 . . . ." *Id.*    The remaining sections of the complaint, including the substantive sections outlining CART's claims, do not refer to a § 1983 cause of action.

CART does not mention § 1983 or the Equal Protection Clause in the amended complaints, and CART fails to argue *in favor of* its § 1983 claims in any subsequent briefings. Rather, in its motion for trial de novo as to the Title VI claims, CART makes a legal conclusion that the FHA's "approval of a mega-project strategy in the SFEIS, selection of alternatives, and the RROD . . . violated . . . equal protection rights." However, in the introductory section of that brief, CART states that it cannot maintain its § 1983 claims against the Federal Defendants. The Court agrees. Accordingly, the Court finds that CART has dismissed any § 1983 claims against Federal Defendants.

In the ensuing portions of the motion for trial de novo, CART does not argue that the State Defendants are liable under § 1983 for Equal Protection Clause violations. CART itself implies that the only discrimination claims it maintains are Title VI claims against the State Defendants. *See* ECF. No. 179-1 ("CART agrees that 42 U.S.C. § 1983 does not provide a right of action against FHWA Defendants. CART argues that the Court has jurisdiction on its claims for intentional race discrimination brought under Title VI against the named state officials."). Thus,

funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution." *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978). Specifically, § 2000d provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Essentially, CART argues that the Project, both in its design and implementation, discriminates against and fails to adequately consider the interest of minority groups.

CART concedes that these claims cannot lie against the FHA and the federal officers named in their official capacities.[33] However, by virtue of Congressional abrogation of sovereign immunity in 42 U.S.C. § 2007d-7, CART continues to pursue these claims against the named state officials in their official capacities—that is, Michael Hancock, Secretary of the Kentucky Transportation Cabinet, and Michael B. Cline, Commissioner of the Indiana Department of Transportation. The Court assumes for practical purposes that CART is correct in this contention. CART implicates Title VI in Claims 3, 9, 14, 15, and 17. The Court will address each in turn.[34]

---

CART seems to abandon these claims against State Defendants as well. Moreover, the complaint do not set out a proper Equal Protection Clause claim under § 1983 against the State Defendants. Therefore, the Court must dismiss these claims, as the Court has no basis from which to evaluate potential Equal Protection Clause violations.

[33] The Federal Defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) as to the Title VI claims asserted against them. To be successful on a 12(c) motion, plaintiff must include in its pleadings "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010). Title VI only applies to recipients of federal funding, not those who supply funding or serve as conduits through which federal funding is distributed. Accordingly, Title VI claims cannot be lodged against the Federal Defendants, and the Federal Defendants cannot be liable for the misconduct alleged. CART agrees that this is the law. Therefore, the Court will dismiss the Title VI claims against the Federal Defendants.

[34] Except for citations to paragraphs supporting these claims in the complaint, CART has not made clear whether it intends to pursue most of these claims as Title VI causes of action. However, the Court will address each claim out of an abundance of caution.

## A.

### Standing

Initially, Defendants argue that CART lacks standing to pursue their Title VI claims. The doctrine of standing requires a plaintiff to show a concrete and particularized injury, a causal connection between the injury and the challenged conduct, and that court's decision will likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Supreme Court has clearly set out the appropriate standard for analyzing whether CART, as a membership association, has standing in this case. *See Friends of the Earth*, 528 U.S. at 181. It states that a membership association

> has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit.

*Id.* Here, the principal issue is whether CART's members would otherwise have standing to sue in their own right.

A member of an organization has standing to sue "when he has suffered a concrete and particularized injury in fact that is fairly traceable to the defendant's actions and a favorable decision would redress his injury." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004). The injury must be particular to the plaintiff, rather than generalized averments or conclusory allegations. *Friends of the Earth*, 538 U.S. at 184. When the injury is based on fear of future injury, a plaintiff must show a reasonable probability that the defendant's continuous and pervasive conduct would cause the injury. *Id.* Plaintiffs may satisfy these standing requirements through affidavits that specifically name the affected

members and explain their particularized injuries.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).

Here, CART has not articulated a *particularized* injury to any individual members of its organization.[35]  CART did file the affidavit of Mattie Jones for this purpose. *See* ECF No. 214. However, her affidavit merely recounts the history of her life in Louisville and the problems Louisville residents suffer as a result of pollution.  It asks questions and expresses concerns regarding the Project, but it does not describe her particularized and concrete injuries.  Jones does not claim to use the Ohio River bridges often or to work in or visit Southern Indiana regularly.  Her income is unclear, so the impact of tolling is impossible to ascertain.  And she does not claim that she currently suffers from or fears future health ailments as a result of increased pollution.  Accordingly, the Court has serious questions whether CART has standing to pursue the Title VI claims.

Again, due to the public nature of this suit and the import of CART's Title VI claims, the Court will nevertheless address their substance.

## B.

### Claims 3, 9, 14, 15 & 17: NEPA Claims Mentioning Title VI

Title VI claims are of a very different nature than the other statutory causes of action in this case.  Title VI claims must assert that plaintiffs are excluded from the benefits of a federally funded program on the basis of race, color, or national origin.  For example, the paradigmatic Sixth Circuit case on Title VI concerns allegations that the defendants excluded the plaintiff from

---

[35] In its motion for trial de novo, CART does assert "that individual members reside in and travel through the affected project areas and would suffer both concrete and procedural injuries to their aesthetic interests related to the enjoyment of water and wildlife resources in the Ohio River, Harrods and Beargrass Creek corridors."  ECF No. 178.  This recitation does not sufficiently assert a particularized injury required for Article III member organization standing and moreover lacks adequate evidentiary support.  CART identifies no individualized injuries.

a federal assistance program because of his race, when the defendant police officers detained him, "forced [him] to wash vehicles in lieu of allowing [him] the opportunity to do his homework," and improperly cared for him during his detention. *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir. 1996). For the reasons the follow, the Court concludes that CART does not actually assert proper Title VI causes of action in conjunction with its assertions of NEPA violations in these claims.

i.

CART alleges in Claim 3 that the Project's imposition of tolls will have significant and prolonged adverse impacts to protected low income minorities. Additionally, CART contends that traffic diversion from drivers avoiding tolled routes will lead to increased travel through West Louisville due to drivers preferring the non-tolled Sherman Minton Bridge. With more vehicles driving through West Louisville, air quality in that area will suffer. CART's Claim 9 proposes that Defendants' approval of the Downtown Crossing, and specifically the decision not to vigorously explore One Bridge/Highway Alternatives, causes disproportionate impacts upon Title VI populations.

Claims 3 and 9 do not complain about the inability of CART or its members to receive the benefits of federal funding on account of their race, color or national origin. Title VI contains no substantive provisions requiring the type of consideration and review CART proposes in these claims. *Cf. Madison-Hughes v. Shalala*, 80 F.3d 1121, 1124 (6th Cir. 1996). Therefore, upon a careful reading of the complaint, the Court concludes that Claims 3 and 9 do not actually assert Title VI violations. Rather, CART refers to Title VI in these claims merely to support its objections to Defendants' reasonable alternative analysis. The Court already

addressed CART's reasonable alternative analysis challenges in Section C of Part III of this Memorandum Opinion.

ii.

Claims 14 and 17 fall short of stating Title VI claims as well. In Claim 14, CART contends that Defendants' 2003 Purpose and Need Statement, revalidated in 2012 even after state representatives filed a Title VI complaint, failed to incorporate certain Title VI population socioeconomic data and impact analyses, resulting in an overly narrow Purpose and Need Statement. In Claim 17, CART argues that Defendants failed to initiate a supplemental EIS after contractors reduced construction cost projections. CART essentially alleges that the reduction in cost projections eliminated the need for tolling, and Defendants should have undergone a supplemental EIS process to reevaluate the Project's implementation of tolls given the adverse impacts of tolling on Title VI populations. Both of these claims are actually accusations of NEPA violations, contesting Defendants' decision making processes rather than a resulting inability of minority populations to access the benefits of a federally funded program. Accordingly, these are not properly alleged Title VI claims, and the Court refuses to analyze them as such. These claims are dismissed in Section B of Part III for the reasons stated therein.

Like Claims 3 and 9, CART refers to Title VI in Claims 14 and 17 to bolster its arguments that Defendants' NEPA decisions were arbitrary and capricious, but does not assert distinct Title VI claims. To the extent CART does intend to assert these claims under Title VI, they are dismissed.

Finally, CART asserts two related NEPA implicating Title VI claims in Claim 15. Specifically, CART asserts that Defendants' failed to take a hard look at West Louisville socioeconomic factors in the scoping process and that Defendants' proposed mitigation plans do not benefit Title VI populations, both in violation of NEPA. Again, these claims are not proper Title VI claims, so the Court must examine them under NEPA standards.

As stated often throughout this opinion, NEPA is a procedural statute that does not mandate particular results. *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001). Courts need only determine whether Defendants took a hard look at the environmental impacts of their decision. The Final EIS, Supplemental Final EIS, and Revised ROD identify and address the Project's adverse effects on minority populations. Defendants analyzed a number of studies examining adverse impacts to minorities, encouraged input from low income and minority community representatives, and adopted various mitigation strategies to address the potential for disparate impacts. Consequently, Defendants did take the necessary hard look at the consequences of the Project to Title VI communities, and their decisions in investigating socioeconomic impacts and in choosing the Modified Selected Alternative did not violate NEPA.

To the extent CART asserts NEPA claims in Claim 15, those claims are dismissed.

C.

Claim 15: Intentional Discrimination

Finally, the Court turns to CART's true Title VI claim.[36] In Claim 15, CART alleges that Defendants' actions in approving the Supplemental Final EIS and the Revised ROD purposefully and intentionally discriminated against Title VI residents in a number of ways, including 1) formulating a narrow Purpose and Need Statement that avoided consideration of alternative public transit modes, regional economic dislocation caused by the Project, and disproportionate economic consequences to West Louisville; 2) eliminating state funding for the Transportation Tomorrow ("T2") light rail project; 3) ignoring the socioeconomic impacts of the Project on West Louisville during the scoping process; 4) adopting tolls that disproportionately burden low income patrons of the cross-river corridors, most notably minority populations; and 5) failing to properly mitigate the Project's disproportionate impacts on Title VI populations.

The Sixth Circuit outlined the summary judgment standard for a § 2000d, Title VI claim as follows:

> to avoid summary judgment on a claim under § 2000d, a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race. To establish a genuine issue of material fact that the defendants intentionally discriminated against plaintiff[] on the basis of his race, plaintiff must demonstrate that the decision to exclude [plaintiff] from a federally financed program was motivated by race and that his race was a determining factor in the exclusion. In other words, proof of discriminatory intent is critical.

---

[36] The Court notes that Defendants articulate two arguments as to why Claim 15 does not validly state a Title VI claim. First, Defendants argue that because CART cannot sue the FHA for its actions under Title VI, CART is improperly suing the State Defendants "through the back door what it has admitted the law does not permit it to do through the front." ECF No. 193-1. Without affirmatively holding that the State Defendants can be sued under Title VI in these circumstances, the Court will not dismiss the Title VI claims on this ground, especially since the State Defendants participated in the initial conceptual development of the Project, contributed significantly to the NEPA process, and are responsible for implementing the Modified Selected Alternative. Second, Defendants argue that CART's Title VI claims actually challenge the Project for discrimination against low income communities rather than against racial minority groups. However, as CART explains, discrimination against low income communities is all too often inextricably bound with discrimination against racial minority communities in Louisville. For a myriad of reasons, the Court cannot distinguish between the two for purposes of the Title VI analysis. Accordingly, Defendants' arguments are unpersuasive.

It follows that where the decisionmaker is motivated by a factor other than the excluded party's race, there can be no intentional discrimination.

*Buchanan*, 99 F.3d at 1356 (internal citations omitted). The parties agree that discriminatory intent can be proven in the manner prescribed in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977)[37], which states

The impact of the official action whether it "bears more heavily on one race than another," *Washington v. Davis*, supra, 426 U.S., at 242, 96 S.Ct., at 2049 may provide an important starting point. . . . Absent a pattern [of stark discrimination], impact alone is not determinative, and the Court must look to other evidence.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. . . .

The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.

*Id.* at 266-68 (internal citations and footnotes omitted). CART argues that disproportionate impact, the historical background of the decision, and the Administrative Record evidence a discriminatory intent. Defendants vigorously oppose this contention.

i.

Most notably, CART alleges that the tolling facilities will disproportionately burden low income areas, resulting in a disparate impact upon minority communities. Defendants concede

---

[37] *Village of Arlington Heights* defined the requisite standard for discriminatory intent within an Equal Protection Clause analysis. Nevertheless, most courts including this one, and importantly the parties to this case, agree that this standard also applies to a discriminatory intent analysis under Title VI. *See Schmidt v. Boston Hous. Auth.*, 505 F. Supp. 988, 992-93 (D. Mass. 1981).

that the imposition of tolls will burden low income communities greater than other more affluent communities. Indeed, the disparate impact of bridge tolls is a mathematical fact, but is not an indication of discriminatory intent. This conclusion is not meant to sound harsh and dismissive. In truth, any non-graduated tax, levy, or toll on an entire community will necessarily inflict a disproportionate burden on low income populations. However, no legal authority suggests that such a tax burden even circumstantially shows discriminatory intent. Something more is legally required.

The United States Supreme Court had said that evidence of a discriminatory impact "may provide an important starting point," and absent the rare circumstances where the impact evidences "a clear pattern, unexplainable on grounds other than race, . . . impact alone is not determinative, and the Court must look to other evidence." *Id.* at 266. The case at bar is unlike the cases cited in *Village of Arlington Heights*, where discriminatory impact of an action is severe enough to undercut any other reasonable justification for the action. *See Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) ("The [Supreme] Court has made clear that the type of impact sufficient in itself to prove intentional discrimination is that which is significant, stark, and unexplainable on other grounds.").

CART's asserted impacts are vague, unsupported, and speculative. Non-tolled alternatives for cross-river travel, such as the Sherman Minton Bridge, are accessible to citizens residing or working in West Louisville. Non-automobile alternatives also service West Louisville, including the bus and trolley transit systems. Moreover, CART has not presented evidence or even alleged that citizens of West Louisville will use the Downtown or East End Crossings with any regularity, especially considering the location of the Sherman Minton Bridge.

Allegations that any significant traffic diversion into West Louisville will result from automobile drivers attempting to avoid tolls have no statistical or other evidentiary support in the record.

Moreover, the Administrative Record fails to demonstrate other evidence of discriminatory intent associated with the imposition of tolls sufficient to buttress the allegations of discriminatory impact so as to establish discriminatory intent. Defendants did not target minority communities, and nothing in the record suggests that a higher percentage of Title VI communities will pay tolls relative to other communities. Defendants clearly adopted tolling as a revenue source to fund the Project, not with any intent to burden minority populations. *See, e.g.*, Revised ROD, at 10-11; Supplemental Final EIS, at 5-28–38. Accordingly, the impact of and purpose behind tolling do not establish discriminatory intent for purposes of Title VI liability.

In support of this claim, CART advances two other allegations of discriminatory impact resulting from tolling. First, CART argues that the Project will shift Louisville's economic gravity further from poorer and minority populations, although CART is unclear as to how or why tolling would lead to this end. However, CART fails to present any evidence other than baseless conclusions that Defendants intended to shift economic growth away from West Louisville through the Project. The shift in economic gravity is merely derivative of the economic growth that will likely ensue as a result of the Project.

Second, CART alleges that criminal prosecutions arising from the failure to pay tolls will have a disproportionate effect on minority populations. Not only are these arguments purely speculative, they do not even remotely support a discriminatory intent argument. That minorities may be incarcerated at higher rates than majority populations as to entirely different crimes does not suggest Defendants' discriminatory animus concerning bridge tolls or future criminal

prosecutions for failure to pay them. Accordingly, these two alleged discriminatory impacts do not support a conclusion of discriminatory intent.

ii.

CART contends that Defendants purposely formulated a narrow Purpose and Need Statement in an effort to eliminate public transit alternatives, which would arguably benefit low income minorities more than the Modified Selected Alternative. The Court, as always, is not obliged to accept conclusory allegations, and CART fails to proffer any evidence or support from the Administrative Record to prove that Defendants purposefully eliminated public transit options. Rather, the Administrative Record emphasizes that Defendants designed the Project to enhance cross-river mobility for the Louisville Metropolitan Area. *See, e.g.*, Final EIS, at 2-6; Revised ROD, at 6-7. The history of the decision convincingly demonstrates that Defendant harbored nondiscriminatory motivations in pursuing the Modified Selected Alternative. This precludes an inference of discriminatory intent.

In fact, Defendants did examine the development of alternative transportation systems and determined that these systems would not meet the region's commuting needs. CART admits that Defendants considered alternate transportation systems, including light rail, but rejected the alternative because of the high cost of implementation and low ridership projections. Inherent in such findings is an evaluation of the propriety of a light rail system. *See* Final EIS, at 3-10–12, 36–38. Though CART may have a different view of transportation priorities, these policy choices do not evidence discriminatory intent.

iii.

CART next argues that by promoting the Project, Defendants somehow intended to crowd out the competing T2 light rail project. However, CART fails to connect the T2 project to the Project. The Transit Authority of River City ("TARC") initiated the exploration into the development of a light rail transit system for the Louisville Metropolitan area. It engaged in a completely separate EIS process under the Federal Transit Authority, not the FHA. In the end, TARC decided not to further pursue the T2 project. TARC is an entity distinct from the Bridges Authority. Further, Defendants intended the Project to enhance cross-river mobility, which was not the aim of the T2 project. Therefore, Defendants' involvement in the Project is unrelated to the T2 project. CART has presented no evidence to the contrary, aside from conclusory allegations. Accordingly, this argument does not evidence discriminatory intent Defendants in pursuing and implementing the Project.

iv.

CART also asserts that Defendants ignored certain socioeconomic conditions in order to perpetuate the status quo in Title VI areas and maintain a pool of arrestees to support the law enforcement and judicial systems. CART fails to support these averments with any evidence.

The Administrative Record demonstrates that Defendants carefully considered the benefits and burdens that the numerous alternatives would bestow upon Louisville as a whole and the individual communities within the greater metropolitan area. Defendants and the Administrative Record cite to studies investigating Project impacts on low income minorities. CART can argue that the studies were improvident, but the issue here is whether Defendants

acted with a discriminatory purpose. The research and analysis presented in the Administrative Record clearly indicate that Defendants exhibited no such animus.

In sum, these arguments are speculative and unsupported in the record, and lacking in any reasonable suggestion of discriminatory intent.

v.

Finally, CART asserts that the $20 million appropriation for the Trolley Barn Rehabilitation Project was wasteful and did not improve the transportation needs borne by Title VI populations. Defendants state that they did not adopt the Trolley Barn rehabilitation effort to mitigate impacts to low income or minority communities, but rather to promote the area's architectural history by restoring Trolley Barn Buildings and adapting them to a more culturally enriching functionality. *See* Final EIS, at 8-29; Supplemental Final EIS, at 1-8.

Regardless of the purpose behind the Trolley Barn Rehabilitation Project, CART's assertion here is devoid of any evidence of racial or otherwise discriminatory intent. The Court is in no position to determine whether the $20 million appropriation for this effort was wasteful, but even if it was, CART fails to connect the wastefulness to a discriminatory purpose. CART's position that Defendants advanced this venture, and other mitigation efforts, in order to placate those opposing the Project on Title VI grounds is baseless and speculative. Moreover, that the Trolley Barn Rehabilitation Project does not in fact improve the needs of Title VI areas does not mean the mitigation effort is designed to discriminate. This claim, even if true, does nothing to further CART's Title VI claim.

Accordingly, CART has not proven that Defendants acted with discriminatory intent in approving and implementing the Project, and its Title VI claims must fail.[38]

## VII.

The discussion and debate over the Project, and specifically building a new bridge, has extended for several decades. Various interested parties have expressed every conceivable alternative, from doing nothing to demolishing and completely rebuilding our highway system.

No doubt Defendants have driven the investigation and planning of action to address the region's transportation needs. No doubt along the way they reached conclusions about the Project scope and design. Defendants, as representatives of elected officials, are entitled to make such judgments, so long as they follow the rules of responsible inquiry and so long as the actual facts and opinions of record reasonably support those judgments.

The Court, and anyone associated with the Project, will concede that interested persons could reach different conclusions concerning the region's transportation needs and their appropriate resolution. Again, the Court's only role is to determine whether Defendants followed the applicable regulatory framework and reached conclusions that the Administrative Record supports. After closely examining the record and arguments, and based on the foregoing analysis, the Court finds that Defendants have met their burdens in that respect. As such, the Court concludes that Defendants reasonably exercised their discretion in making decisions about

---

[38] The Court notes that CART further argues that the motion for summary judgment as to the Title VI claims should be denied as premature. According to Federal Rule of Civil Procedure 56(d), the Court may delay a summary judgment ruling, or deny it altogether, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(d); *see CareToLive v. Food & Drug Admin.*, 631 F.3d 336, 345 (6th Cir. 2011) ("Rule 56(d) recognizes that there are instances when a party lacks the necessary facts to properly contest a summary judgment motion. However, the party must at least specify what information is missing."). CART failed to submit an affidavit or otherwise present any statements detailing specifically what information it hopes to compile. Accordingly, the Court finds this argument unavailing.

the Project's scope, design and financing. Moreover, Defendants' actions during the planning process and the final decisions do not suggest any actionable discriminatory intent.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Federal Defendants' Motion for Judgment on the Pleadings (ECF No. 174) is SUSTAINED, and CART's claims for relief directly under the Clean Air Act, Clean Water Act, and Title VI as asserted against the Federal Defendants are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Kentucky's Motion for Summary Judgment (ECF No. 191), Indiana's Cross Motion for Summary Judgment (ECF No. 193), and Federal Defendants' Cross Motion for Partial Summary Judgment (ECF No. 201) are SUSTAINED and all remaining claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that CART's Motion for Trial (ECF No. 179) and Motion for Summary Judgment (ECF No. 178) are DENIED as moot.

This is a final order.

cc:     Counsel of Record